NO. 24-11843-F

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**
—————————

**UNITED STATES OF AMERICA,**
*Plaintiff/Appellee*,

**v.**

**CHARLIE HOLLEY,**
*Defendant/Appellant.*

—————————

**On Appeal from the United States District Court
for the Southern District of Florida**
—————————

**INITIAL BRIEF OF APPELLANT
CHARLIE HOLLEY**
—————————

> **HECTOR A. DOPICO**
> **Federal Public Defender**
> **MICHAEL CARUSO**
> **Assistant Federal Public Defender**
> **Attorney for Appellant**
> **150 West Flagler Street, Suite 1700**
> **Miami, Florida 33130**
> **Telephone No. (305) 530-7000**

**THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)**

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

## United States v. Charlie Holley
## Case No. 24-11843-F

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Abrams, Stewart G.

Becerra, Hon. Jacqueline

Brenner, Michael

Caruso, Michael

Catala, Maria

Damian, Hon. Melissa

Dopico, Hector

Dunham, Christian Scott

Fajardo Orshan, Arianna

Gonzalez, Juan Antonio

Hoffman, Alexandra Ann

Holley, Charlie

Keller, Zachary A.

King, Hon. James Lawrence

Klco, Sara Michele

Lapointe, Markenzy

Matzkin, Daniel

Maultasch, Lindsey

Rosenzweig, Will

Ruiz II, Hon. Rodolfo A.

Stamm, Edward N.

Torres, Hon. Edwin G.

United States of America

United States Postal Office

Wicker, Charlotte


*/s/ Michael Caruso*
Michael Caruso

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Holley respectfully submits that oral argument is necessary because this appeal presents several important issues, including whether the government's introduction of police body-worn camera footage violated Mr. Holley's Sixth Amendment right to confront the witnesses against him. In addition, whether the district court's decision to allow the jury to hear out-of-court statements that showed how the government "built out the investigation" violated Federal Rules of Evidence 401–403.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF CITATIONS ........................................................... v

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ....................................................................... 1

STATEMENT OF THE ISSUES................................................... 2

STATEMENT OF THE CASE ..................................................... 3

    Course of Proceedings and Disposition in the District Court ......... 3

    Statement of Facts .......................................................... 11

    Standards of Review......................................................... 34

SUMMARY OF THE ARGUMENTS...................................................... 35

ARGUMENTS AND CITATIONS OF AUTHORITY ............................. 39

I. The district court violated Mr. Holley's Sixth Amendment right to confrontation by admitting various testimonial witness statements made to a police officer and captured on a body-worn camera. In the alternative, the district court erred because these statements were inadmissible hearsay. The

district court's ruling also violated Federal Rules of Evidence 401–403 ........................................................................ 39

    A.    The Confrontation Clause bars the use of "testimonial" statements—which include witness statements made to investigating police officers—like the statements made to Officer Neyra and depicted on the body-worn camera footage ........................................................................ 40

    B.    The district court also erred because the witnesses' statements on the body-worn camera footage constitute inadmissible hearsay. ............................................... 47

    C.    The body-worn camera footage also violated Rules 401–403. ................................................................... 51

II.    The district court allowed the government to introduce the entire 911 call made by an unidentified man and the statements made by a different unidentified man at the scene who claimed to be Mr. Holley's brother. The district court erred because these statements were inadmissible hearsay and violated Federal Rules of Evidence 401–403. ......................... 55

    A.    The unidentified 911 caller ...................................... 55

B.    The unidentified "brother"......................................................59

III.   By failing to adequately weigh the impact that Mr. Holley's mental health crisis had on the commission of the offense, the district court imposed a substantively unreasonable sentence .... 61

CONCLUSION .......................................................................... 67

CERTIFICATE OF COMPLIANCE......................................... 68

CERTIFICATE OF SERVICE................................................ 69

# TABLE OF CITATIONS

**Cases:**

*Ameritas Variable Life Ins. Co. v. Roach*,

    411 F.3d 1328 (11th Cir. 2005) ......................................................... 63

*Bemis v. Edwards*, Cro

    45 F.3d 1369 (9th Cir. 1995) .............................................................. 51

*Carrizosa v. Chiquita Brands Int'l, Inc.*,

    47 F.4th 1278 (11th Cir. 2022). .......................................................... 48

*Chapman v. California*,

    386 U.S. 18 (1967) ............................................................................. 34

*Crawford v. Washington*,

    541 U.S. 36 (2004) ...................................................... 34, 41, 42, 44, 46

*Davis v. Washington*,

    547 U.S. 813 (2006) ...................................................... 41, 42, 43, 45

*Gall v. United States*,

    552 U.S. 38 (2007) ............................................................ 6, 62, 63, 65

*Michigan v. Bryant,*

    562 U.S. 344 (2011) ........................................................................... 44

*Old Chief v. United States,*

    519 U.S. 172 (1997) ............................................................ 58

*United States v. Campa,*

    459 F.3d 1121 (11th Cir. 2006) (*en banc*) ............................. 63

*United States v. Cooper,*

    926 F.3d 718 (11th Cir. 2019) .......................................... 46

*\*United States v. Curbelo,*

    726 F.3d 1260 (11th Cir. 2013) ........................................ 45

*United States v. Hano,*

    922 F.3d 1272 (11th Cir. 2019) ........................................ 46

*United States v. Hinton,*

    423 F.3d 355 (3d Cir. 2005) ............................................. 45

*United States v. Holden,*

    625 F. App'x 316 (9th Cir. 2014) ..................................... 50

*United States v. Hunerlach,*

    197 F.3d 1059 (11th Cir.1999) ........................................ 34

*\*United States v. Irey,*

    612 F.3d 1160 (11th Cir. 2010) ............................. 61, 63, 66

*United States v. Irizarry-Sisco,*

    87 F.4th 38 (1st Cir. 2023) ................................................... 48

\*United States v. Jones,

    930 F.3d 366 (5th Cir. 2019) ...................................... 54, 60

*United States v. Kent,*

    93 F.4th 1213 (11th Cir. 2024) .......................................... 34

\*United States v. Kizzee,

    877 F.3d 650 (5th Cir. 2017) .....................................54, 60

*United States v. Lasley,*

    917 F.3d 661 (8th Cir. 2019) ............................................54

*United States v. Lentz,*

    282 F. Supp. 2d 399 (E.D. Va. 2002), *aff'd*, 58 F. App'x 961

    (4th Cir. 2003) ..................................................................50

\*United States v. Leones,

    No. 22-12456, 2024 WL 340324 (11th Cir. Jan. 30, 2024)...... 49, 50, 57

*United States v. Mills,*

    704 F.2d 1553 (11th Cir. 1983) .........................................52

\*United States v. Minners,

    362 F. App'x 931 (10th Cir. 2010) ............................... 53, 60

*United States v. Nelson*,

    725 F.3d 615 (6th Cir. 2013) ......................................................... 54,55

*United States v. Rewald*,

    889 F.2d 836 (9th Cir. 1989) ............................................................. 52

*United States v. Rodriguez*,

    591 F. App'x 897 (11th Cir. 2015) ...................................................... 48

**United States v. Sallins,*

    993 F.2d 344 (3d Cir. 1993) ................................................... 47, 53, 60

*United States v. Scrima*,

    819 F.2d 996 (11th Cir. 1987) ............................................................ 48

*United States v. Underwood,*

    446 F.3d 1340 (11th Cir. 2006) ......................................................... 34

*United States v. Wall*,

    116 F.4th 1285 (11th Cir. 2024) ................................. 16, 31, 32, 34, 50

## Constitutional Provisions

U.S. Const. amend. VI ............................ 8, 9, 35, 39, 40, 41, 42, 54 60, 62

## Statutes

18 U.S.C. § 111(a)(1) and (b) ...................................................... 3

18 U.S.C. § 924(c)(1)(A)(ii)(iii) ................................................... 3

18 U.S.C. § 924(c)(1)(A)(iii) ................................................................. 3, 10

18 U.S.C. § 922(g) ...................................................................................... 3

18 U.S.C. § 1114(3) ..................................................................................... 3

18 U.S.C. § 3231 ......................................................................................... 1

18 U.S.C. § 3742 ......................................................................................... 1

18 U.S.C. § 4241(d) ................................................................................. 4, 5

18 U.S.C. § 4241 ..................................................................................... 4, 5

 18 U.S.C. § 4247 ......................................................................................... 5

18 U.S.C. § 3553(a) ................................................... 33, 61, 62, 65, 66, 67

18 U.S.C. § 3553(a)(1) .............................................................................. 61

28 U.S.C. § 1291 ......................................................................................... 1

11th Cir. R. 28-5 .......................................................................................... 3

## Rules and Other Authority

Fed. R. Evid. 401 ...................................................................................... 51

Fed. R. Evid. 402 ...................................................................................... 51

Fed. R. Evid. 403 ...................................................................................... 52

Fed. R. Evid. 602 ...................................................................................... 48

Fed. R. Evid. 803(6) ................................................................. 47, 48, 49, 57

Fed. R. Evid. 805 ...................................................................................... 47

Fed. R. Evid. 803(1) ............................................................ 47, 48, 49, 57

Fed. R. Evid. 803(2) ................................................................. 48

Fed. R. Evid. 803(1)–(2) Advisory Committee's Note (1972) ................. 49

Fed. R. Evid. 803 Advisory Comm. Notes (1972) .................................... 49

2 McCormick on Evidence § 249 (4th ed. 1992) ................................ 53, 60

2 McCormick on Evidence § 249 (8th ed.) ........................................ 53, 60

7 Handbook of Fed. Evid. § 803:1 (9th ed.) ...................................... 49, 57

Henry J. Steadman & Michelle Naples, *Assessing the Effectiveness of Jail Diversion Programs for Persons with Serious Mental Illness and Co-Occurring Substance Use Disorders*,

23 Behav. Sci. & L. 163 (2005) ........................................................... 61

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. §3231 because Mr. Holley was charged with an offense against the laws of the United States. The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was timely filed on June 3, 2024, from the judgment and commitment entered on May 29, 2024, which dispose of all claims between the parties.

## STATEMENT OF THE ISSUES

### ISSUE I

The district court violated Mr. Holley's Sixth Amendment right to confrontation by admitting various testimonial witness statements made to a police officer and captured on a body-worn camera. In the alternative, the district court erred because these statements were inadmissible hearsay. The district court's ruling also violated Federal Rules of Evidence 401–403.

### ISSUE II

The district court allowed the government to introduce the entire 911 call made by an unidentified man and the statements made by a different unidentified man at the scene who claimed to be Mr. Holley's brother. The district court erred because these statements were inadmissible hearsay and violated Federal Rules of Evidence 401–403.

### ISSUE III

By failing to adequately weigh the impact that Mr. Holley's mental health crisis had on the commission of the offense, the district court imposed a substantively unreasonable sentence.

## STATEMENT OF THE CASE

The appellant, Charlie Holley, was the defendant below and will be referred to by his name. The appellee will be referred to as the government. The record will be noted under 11th Cir. R. 28-5.

Mr. Holley is incarcerated.

### Course of Proceedings and
### Disposition in the District Court

A federal grand jury indicted Mr. Holley with attempted murder, 18 U.S.C. §1114(3), assaulting, resisting, or impeding a federal employee, 18 U.S.C. §111(a)(1)and(b), brandishing and discharging a firearm in furtherance of a crime of violence, 18 U.S.C. §924(c)(1)(A)(ii) and(iii), and possession of a firearm and ammunition by a convicted felon, 18 U.S.C. §922(g). (DE6).

### A.    Competency Proceedings

After his initial appearance, defense counsel filed an unopposed motion that requested the court order the Bureau of Prisons (BOP) to evaluate Mr. Holley's competency to stand trial and his mental state at the time of the alleged offense. (DE10). The court found that counsel demonstrated that Mr. Holley presently suffered from a mental disease or defect rendering him mentally incompetent to understand the nature

and consequences of the proceedings against him or to assist properly in his defense. (DE32). Accordingly, pursuant to 18 U.S.C. § 4241(d), the court committed Mr. Holley to the custody of the Attorney General for hospitalization and treatment. (DE32).

In response to the court's order, BOP medical staff prepared a forensic evaluation report. (DE24). The evaluator determined that Mr. Holley may have a mental disorder that significantly impaired his present ability to understand the nature and consequences of the proceedings against him. (DE 24). The evaluator recommended that Mr. Holley be committed to a federal medical center to participate in competency restoration treatment. (DE24). Although the court also tasked the evaluators with conducting a sanity determination, a forensic psychologist determined that Mr. Holley was not currently able to provide a rational account regarding his mental status at the time of the alleged offenses, and, therefore, they did not pursue the sanity issue. (DE24). The psychologist noted, however, that once BOP had established Mr. Holley's competency to proceed, "a more comprehensive assessment of Mr. Holley's sanity should also be completed." (DE 24).

After receiving this report, Mr. Holley's counsel filed a Motion for

Competency Hearing under 18, U.S.C. §§4241 and 4247. (DE21). At a subsequent hearing, defense counsel reiterated his request for a finding that Mr. Holley was not presently competent to proceed and that he should be committed to the custody of the Attorney General for a determination regarding competency restoration. (DE21).

BOP medical staff at a different institution then submitted an evaluation to the court. (DE39). In this evaluation, BOP medical staff confirmed that Mr. Holley was not presently competent to proceed but that his mental condition may improve with additional time for treatment. (DE39). Consequently, the evaluators requested that Mr. Holley remain hospitalized for an additional reasonable period. (DE39). According to the evaluators, they believed that there was a substantial probability that Mr. Holley's competency could be restored with medication. (DE39). The evaluators also indicated that Mr. Holley's sanity should be more thoroughly evaluated once his competency to proceed was established. (DE39). The court agreed and ordered Mr. Holley's continued evaluation and treatment. (DE39).

Based on this order, BOP medical staff conducted another evaluation and submitted a report. (DE52). This report indicated that

while Mr. Holley may have a mental disease, his reported symptoms do not appear to impact his ability to understand the nature and consequences of the legal proceeding or to assist properly in his defense at this time. (DE52). Consequently, BOP medical staff found Mr. Holley competent to stand trial. (DE52).

At the competency hearing, the government indicated that they agreed with the evaluator that, at present, Mr. Holley was legally competent to stand trial. (DE52). Counsel for Mr. Holley clarified that although they stipulated to the report's contents, they did not concede that the BOP's competency finding was correct. (DE52).

Dr. Osborn appeared at the hearing via Zoom and testified about her evaluation of Mr. Holley at MCC Chicago from January 20, 2023, to September 12, 2023. (DE52). At the conclusion of the competency hearing, the court found  that Mr. Holley presently suffered from a mental disease or defect. (DE52). The court also found that Mr. Holley "expresses somewhat unique and bizarre beliefs, and there is evidence that such beliefs appear delusional in nature." (DE52).

Notwithstanding these findings, the court ruled that "the preponderance of the evidence demonstrates that these conditions –

viewed both individually and in combination – [did] not establish that Mr. Holley lacks a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding or that he lacks a factual and rational understanding of the proceedings against him." (DE52). Therefore, the court found Mr. Holley competent to proceed to trial. (DE52).

### B.    Pre-Trial Motions

Before trial, the government gave notice that they intended to introduce the following evidence against Mr. Holley: (1) testimony of witnesses who observed him holding a firearm and making threats from his window earlier on the day of the shooting incident; and (2) his prior conviction for possession of a firearm by a convicted felon (including the information and judgment). (DE65).

For his part, Mr. Holley challenged the admissibility of specific body-worn camera footage taken by police officers. (DE131:38–39). He also moved in limine to preclude the government's introduction of a 911 call made by an unidentified person. (DE69).

### 1.    Body-worn camera footage

Mr. Holley objected to the introduction of various "clips" taken from body-worn cameras on the day of the incident as a violation of his Sixth Amendment right to confrontation, as well as being inadmissible hearsay, irrelevant and unduly prejudicial under Federal Rules of Evidence. (DE131:38–39;133:10). The district court asked the prosecutor about the defense's hearsay objection. (DE133:8).The government asserted that the body-worn camera footage that they sought to introduce did not constitute "evidence." (DE134:13). The prosecutor elaborated: "Well, again, our position -- and this is why we didn't do transcripts for any of these, and we're going to be playing them briefly and then moving on, is that *none of this is evidence*."). The government's stated purpose for introducing these clips to the jury was to "build our investigation out." (DE134:8). The district court overruled the defense's objections. (DE134:14–17).

### 2.    911 call from unidentified man

The government sought to introduce a recording of an unidentified man who called 911 after Ms. Wicker heard the shot and her 911 call. (DE69). Mr. Holley asserted that introducing this call would violate his

Sixth Amendment right to confrontation, constitute inadmissible hearsay, and be unduly prejudicial under Federal Rule of Evidence 403. (DE69). The government responded that the caller's statements were nontestimonial, were either excited utterances or present sense impressions, and were relevant "because they corroborate the victim's statements that a shooting occurred, that the Defendant continued to yell after firing his rifle at the victim's postal truck, and that the shooter remained at the scene and did not flee." (DE82). The district court agreed that the call was nontestimonial, satisfied the two proffered hearsay exceptions, and not unduly prejudicial. (DE131:22–23).

### C. Trial

Mr. Holley proceeded to trial. (DE132–135). During the trial, the district court gave the jury the following instruction regarding the body-worn camera footage:

> Now, one thing I want you guys to be advised of. The first few witnesses that the government is going to call were officers who responded to the scene of the alleged incident. There are going to be a number of body-worn cameras that are going to be played for you guys in small clips. In those body-worn cameras, you are going to hear statements made by people on the ground, potential witnesses, people in the neighborhood, about what is happening.

9

You should not, and I repeat, not consider any statements made by anyone in those videos as truth of what is being alleged in this case. Those statements are simply being considered by law enforcement to develop their investigation. So I want you guys to understand, you shouldn't think of anything you hear as being proven or shown. It's more for the state of mind of the officers, so they know things like perimeter, setting up the investigation, things like that. So I just want you guys to understand that.

That includes that one or two clips may have Spanish speakers in them. You should not worry, if you speak Spanish, about trying to translate that for yourself. You're only worried about what the officers did by acting on that information and why they did it, not because what they heard was true or not true.

(DE134:30–31).

The jury acquitted Mr. Holley of the attempted murder charge but convicted him of assault, brandishing and discharging a firearm during and in relation to the assault, and possession of a firearm and ammunition after being convicted of a felony. (DE99).

## D.    Sentencing

After trial, the probation officer completed a Pre-Sentencing Investigation report (PSR). (DE112–113,118). The PSR recommended a guideline range of 70-87 months' imprisonment with a consecutive sentence of 120 months for the §924(c) conviction. (PSI at ¶ 93 & Second Addendum; DE136:2–3,12,36). The court imposed a sentence of 72

months' imprisonment   with a consecutive sentence of 120 months. (DE136:39;DE 122).

## Statement of Facts

## Introduction

At sentencing, Mr. Holley spoke to the Court:

To my kids, my beautiful, handsome, smart, amazing kids, Destiny, Jayden, Maya (phonetic), Shayda (phonetic), Comari (phonetic), Charlese (phonetic), giving a lot of my time to the streets has caused me to miss some of the most important times from your lives, Christmas, birthdays, graduation. Those times has come and gone, and that's something I cannot redo. Me getting locked up for parts of yours lives, missing these cherishable moments is something I always regret. For that, I'm sorry for depriving all of you these years, those memories. I hope all of you can forgive me. Though I have been around, I haven't missed all of these times, more or less, it has happened. When Destiny graduated high school, I was locked up. When Jayden graduated high school, I was locked up. Maya, baby girl, you're next.

And the same, being locked up, I'll miss yours, too. It's not fair to you all. I own up to that. And that's where I failed as a father. I failed you.

These are sentimental and valuable years that I will never be able to replace. As all of you do know, I do love each and all of you equally. That's a fact. Shayda (phonetic), Comari (phonetic) and Charlese (phonetic) are my last three, and they all will be grown by the time I finish this sentence.

When I'm finished with this, we all will create more memories. That, I promise. This life is not -- or not being around, missing time from your lives. I made mistakes, I'm

11

not perfect. All of you will make mistakes. I just hope I'm around to guide and give you the advice on how not to make those mistakes again, and learn from them. I didn't have that in my life. But I'll make these mistakes so you don't have to.

Each of you have wonderful mothers. They must be given credit for the amazing job they have done in raising all of you. I'm the bridge that connects all of you. I'm the person all of you have in common, my creation. But they are the reason you all have become the amazing kids that each of you are. Santana, Simone, Crystal, Priscilla, Ruthie. I thank all of you for giving me healthy, smart, beautiful, handsome children. I appreciate all of you.

And to my kids, daddy loves all of you forever. There is no more life in me.

I remember when I came home the last time, J.J. asked me to promise him that I wouldn't get locked up again. I couldn't do it. I told him I'll try, but I won't promise him that. The reason because I knew I wasn't done with the street life. I had to start over. And I wasn't willing to slowly do that. I was only -- it was the only way I knew how to get the material things I had lost back real quick, the streets. That was selfish of me. But this time, I promise all of you, when I'm done with this time, I'll be done with that life.

My job as a father is to make sure each of you be better in life, be prosperous in life, be productive in life, my sons better than I am, and my daughters better than their mothers. And each of you grow to become mothers and fathers, you teach your kids responsibility, accountability, and availability, and to not miss valuable years from their lives.

Support them, love them, and protect them, and make sure whatever it is they want to do in life, be in life, that you're there for them every step of the way. Because what you do or

don't do with your kids will have an effect on them during their lives.

All I want is for all of you is to bond with your brothers and sisters, because that's something I also never had. Daddy will do this time, and I'll get past this. We'll get past this. I'll learn from this. This will be the last time I do time. I promise. When I get out, I'll be prosperous, I'll be productive. I'll have a more constructive life and lifestyle. This will make me a better person, a better father. Destiny, Jayden, Maya, Shayda, Charlese, Daddy will miss each of you, and I love all of you equally.

Thank you, Judge.

(DE136:32–35). The following are the events that brought Mr. Holley to court.

## The Trial

### A.    Charlotte Wicker encounters Mr. Holley

Charlotte Wicker, a letter carrier for the United States Postal Service, has worked a route in Florida City for the last ten years. (DE133:33–35). As part of her route, she delivered mail in her assigned postal truck to a townhouse where Charlie Holley lived. (DE133:36–38). Ms. Wicker testified at trial that she did not know whether anyone else lived with Mr. Holley, although she had told the case agent before the trial that a woman may have lived there. (DE133:38,58–59;DE 134:128).

Ms. Wicker could not recall if she delivered mail to anyone else at the townhouse. (DE133:38,59–60).

Ms. Wicker had a friendly relationship with Mr. Holley. In particular, Ms. Wicker recalled an encounter where she delivered a package to the townhouse addressed to a "Whitey White." (DE133:37,61–62). Mr. Holley, an African American, told her the package was for him. (DE133:37). Ms. Wicker found that funny, and she and Mr. Holley thought the nickname was "kind of comical, kind of cute." (DE133:37–38).

Ms. Wicker explained that she would place small packages inside the mailbox when she delivered small packages to the townhouse. (DE133:38). If they were larger, Mr. Holley asked her to place them over the privacy fence. (DE133:38;GX 42-C). Mr. Holley also said she could put them on the townhouse's balcony. (DE133:39). She told him that she did not think that was a "good idea" and if he was not at home, she would leave him a notice. (DE133:39).

On June 21, 2021, Ms. Wicker worked her route. (DE133:39). Before she began, she checked her postal truck and found no damage.

(DE133:39–40). As part of her route, she had a package for "Whitey White." (DE133:40–41;GX 15-A).

When Ms. Wicker approached the townhouse, she noticed Mr. Holley inside the townhouse through a second-floor window. (DE133:41; GX 20-C). She did not see Mr. Holley on the balcony. (DE133:64). She said hello and told him she had a package for him that she could leave in the mailbox. (DE133:43). He told her to open the package. (DE133:43). She told him she could not do that. (DE133:43). In a manner she characterized as "aggressive," he told her to open the package. (DE133:43). Again, she said she couldn't. Mr. Holley then said, "Do you think I'm fucking playing with you?" (DE133:43). According to Ms. Wicker, Mr. Holley's voice, attitude, and demeanor changed from what she experienced in the past. (DE133:43).

Before Ms. Wicker arrived at the townhouse, Mr. Holley had an encounter with Sheila Moss. (DE134:68). Ms. Moss has known Mr. Holley for a long time. (DE134:73). When Ms. Moss dropped her niece off in the townhouse next door from where Mr. Holley lived, he pointed a rifle at her and told her to leave the area. (DE134:68-69). She did and drove to a nearby store to pick up her other niece. (DE134:68-69,77). Then she drove

back to the townhouse to get the children out. (DE134:77). Once inside the house, she could hear Mr. Holley through a common wall telling them to get on the ground. (DE134:77). Ms. Moss told her nieces to get on the ground. (DE134:71).

Around this time, Ms. Wicker had left her vehicle to place the package in the mailbox. (DE133:44). Because of Mr. Holley's unusual behavior, Ms. Wicker looked at him and noticed he had a scoped rifle. (DE133:44). She recalled that the rifle stuck out from the open window. (DE133:45). In the moment, Ms. Wicker believed he would hurt or kill her. (DE133:45–46,69-70).

When this exchange occurred, Ms. Wicker was at the front end of her mail truck. (DE133:47). Mr. Holley told her to move to the truck's right (or the back) end. (DE133:47). She did as he instructed. (DE133:47). According to Ms. Wicker, Mr. Holley then said she should move to the left, near the truck's door. As she moved to the left, she didn't stop and got inside the truck, "cranked it up, put it in drive, and moved as fast as [she] could." (DE133:48).

In a written statement she gave shortly after the incident, Ms. Wicker estimated that she had driven twenty feet. (DE133:66–67;DE

134:127–128). Ms. Wicker testified, however, that she drove the truck about 30–40 feet from where she had originally stopped. (DE133:48–49). At trial, she said she moved the mail truck twice. (DE133:67–68).

While stopped, she "heard something hit the vehicle." (DE133:49). She believed the sound to be a gunshot. (DE133:49). Ms. Moss heard a gunshot. (DE 134:77). Neither saw Mr. Holley fire the rifle. (DE133:65; DE134:77).

Ms. Wicker did not clearly recall whether she called 911 before or after hearing the gunshot. First, she testified that she "drove down the street, [] immediately called 911, and that's when she "heard the ping." (DE133:49,73). Later, she testified that she heard the shot, checked to see that she was not hurt, and called 911. (DE133:52). Notwithstanding, she called 911 within five minutes of stopping the car after she left the front of the townhouse. (DE133:49; GX 12 & 12-A). During the 911 call, Ms. Wicker never told the operator that she had heard a gunshot or that a person had shot at her. (DE133:74; GX 14)

Officers arrived at the scene while she was speaking with the 911 operator. (DE133:51). An officer asked Ms. Wicker if she was "okay," and she told the officer she wasn't hurt. (DE133:53–54). According to Ms.

17

Wicker, the officer checked the mail truck and noticed a bullet hole in the back. (DE133:54).

### B.    An unidentified man called 911

After Ms. Wicker called 911, a man called an unidentified 911 operator. (DE134:128–129; GX 14). The caller did not provide his name or an address. (DE134:129; GX 14). Although the officers on the scene did an area canvass where they knocked on doors, they never found him. (DE134:130–131;GX 14). The caller did not identify Mr. Holley either by name or nickname. (DE134:131; GX 14).

During the call, the man told the police operator:

 At my house this man has shot at the mail lady man.

He said he gone kill everybody and he's walking around with a semi automatic rifle.

He shot at her man. He been pulling guns on everybody (inaudible).

(GX 14).Later, when the operator asked the caller for his address he could not. (GX 14).

### C.    The police respond to the scene

In the early afternoon, Patrol Officer Manuel Neyra received a call-out to go to the townhouse regarding the incident. (DE133:87). Officer

Neyra, who was wearing a body camera, believed there to be an active shooter situation. (DE133:87;GX 15-A). Sergeant Barrett, who was on the scene when Officer Neyra arrived, instructed him to set a perimeter—roping off the area and preventing people from entering. (DE 133:89–90). Because the scene was chaotic, Officer Neyra tried to gather and pass information to other law enforcement officers. (DE133:90,92,97; GX 15B-E).

By talking to neighbors, Officer Neyra believed that Charlie Holley, or "White Boy," was involved in the incident. (DE133:95). Officer Neyra also spoke with a woman who said the assailant had a "stick" or long gun. (DE133:95). Officer Neyra did not ask for the names of anyone he spoke to at the scene. (DE133:95,97–98). Officer Neyra left the scene after the police took Mr. Holley into custody later. (DE133:96).

Meanwhile, Sergeant Safiuddin Mohammed, a member of the Priority Response Team, heard a call about the incident and decided to direct his team to the scene. (DE133:106,109). Unlike Officer Neyra, Sergeant Mohammed did not view this as an active shooter scenario. (DE133:109). Rather, after speaking to several Florida City officers, he

learned that "the subject was in his residence at the time, and [therefore] considered [him] a barricaded armed subject." (DE133:109).

After Sergeant Mohammed arrived on the scene, a person who identified himself as "the subject's brother" approached him by car. (DE133:111; GX 50-A). According to Sergeant Mohammed, the "brother" told him Mr. Holley's name, that there was an assault rifle in the townhouse, and that he was alone. (DE133:111; GX 50-A). Although Sergeant Mohammed wore a body camera, he did not record the entire exchange. (DE133:121; GX 50-A). Sergeant Mohammed relayed this information to other officers. (DE133:112).

## D.    Body camera footage

As previously noted, the government introduced various "clips" from body-worn camera footage taken on the day of the incident.

Government Exhibit 15-B initially depicts Officer Neyra creating a perimeter. (DE134:91; GX 15-B). While he taped the area, the clip depicts various unidentified persons running and screaming. (DE134:91–92; GX 15-B). As they approached him, Officer Neyra directed them to go outside the perimeter. (DE134:91–92; GX 15-B). The prosecutor published this

20

exhibit to the jury and asked Officer Neyra to describe what they were seeing and hearing. (DE134:91–92).

Government Exhibit 15-C depicts an unidentified man speaking to his mother on a phone. (DE134:91; GX 15-C). While this man was on the phone, Officer Neyra questioned him about whether he knew the person in the townhouse. (DE134:92–93; GX 15-C). The man asked his mother, "what's White Boy's real name?" (DE134:92–93; GX 15-C). When Officer Neyra followed-up with the man, he said that his mother said, "She just say White Boy." (DE134:92–93; GX 15-C).

Government Exhibit 15-D depicted an officer talking to an unidentified woman. (GX 15-D). In this video, the woman, pointed at a townhouse, and told the officer that is "where the lady got injured." (GX 15-D). She also said that the person "who did it," lives there. (GX 15-D). She also confirmed for the officer that the person is known as "White Boy." (GX 15-D).

Government Exhibit 15-E depicted Officer Neyra talking to an unidentified man, in Spanish, about "White Boy." (GX 15-E). The man told Officer Neyra that "the subject was renting in that area. He was a light, mulatto, tall male with light eyes that was renting." (DE134:94).

Sergeant Mohammed then "establish[ed] a proper perimeter" to ensure the public's safety and evacuate those residents close to the townhouse. (DE133:113). Next, Sergeant Mohammed positioned two "long points" near the townhouse—one near the front door and the other to the east. (DE133:113). The two armed "long points" were to inform Sergeant Mohammed if they saw any movement in the house or if anyone left the house. (DE133:114). To cover the back of the townhouse, Sergeant Mohammed "plugged" most of his team into a house that was under construction—specifically a second-floor bathroom. (DE133:115-116). Sergeant Mohammed and his team held this location for about two hours. (DE133:116–117).

At that time, Sergeant Mohammed saw "a black male exit[] the residence, nonchalantly, walk[] outside, walk[] around his backyard," and then go back inside the townhouse." (DE133:117). About twenty minutes later, the same man left the house, walked around the backyard, and went back inside the house. (DE133:117). Sergeant Mohammed did not know if this man was the "target" or not. (DE133:117). Because the lead detective told him they had not established probable cause, Sergeant

Mohammed did not direct his team to take the man into custody. (DE133:118).

Eventually, Officer Jacob Lendic's PRT relieved Sergeant Mohammed's team. (DE133:128,134–136). After he assumed responsibility, Officer Lendic saw a man through the townhouse's second-story window. (DE133:137). The man was pacing. (DE133:137). Officer Lendic advised his law enforcement colleagues by radio. (DE133:137). He did not see anyone else in the house. (DE133:139).

By this time, the Special Response Team (SRT) was called out. (DE133:118). SRT Officer Luis Aguiar arrived at the scene and spoke with PRT Lieutenant Martinez. (DE133:142,148). Because Officer Aguiar was the first SRT member on the scene, he assumed the sniper role—109 yards from the townhouses. (DE133:148–150). Through his rifle's scope, Officer Aguiar watched the townhouse. (DE133:151).

While watching the townhouse, he saw other SRT team members, including Sergeant Javier Baez, drive an armored truck onto the driveway. (DE133:151,166–167). SRT approached the house, not to enter, but to hold the perimeter and facilitate the negotiators speaking with the person inside the house. (DE133:167).

### E.    Mr. Holley left the townhouse and is taken into custody

Before the negotiators arrived, Officer Aguiar saw a person briefly "stick their hands out" the second-floor window like he was "giving up." (DE 33:151–153; GX 20-A). Shortly after, Mr. Holley came outside the house through the front door. (DE133:168). Officer Aguiar saw SRT members escort the same man he saw in the window from the house in custody. (DE133:151,153–154). Mr. Holley was calm and complied with SRT's commands. (DE133:168). SRT placed him in custody without incident. (DE133:168–169; GX 18).

Patrol Officer Walter Aguilar took Mr. Holley into custody from SRT and transported him to an FBI office. (DE133:186; GX 16-A). Mr. Holley remained calm at all times. (DE133:187–188; GX 16-A).

### F.    The police conduct a sweep of the townhouse

After taking Mr. Holley into custody, Sergeant Baez's SRT group entered the house. (DE 133:161, 168–169; GX 18). During the sweep, they did not see another person in the house and found a rifle lying on a bed. (DE133:171,176–177; GX 17-A, 49). But the sweep revealed that there appeared to be people living in at least two bedrooms. (DE133:176–177; GX 49).

### G. The FBI arrived at the scene to investigate

FBI agent Kristin Bailey received a call to go to the scene of the townhouse. (DE133:198–199). She arrived after Mr. Holley had been taken into custody and the sweep of the house. (DE133:199). Upon arriving at the scene and speaking to her colleagues, they decided to expand the perimeter. (DE133:200–201).

The FBI searched and photographed the exterior while the postal inspectors worked on obtaining a search warrant for the townhouse. (DE133:201–202; GX 20 A-C, D-G). The FBI also searched the inside of the townhouse. (DE133:202). There were no pictures of the mail truck taken at the scene, only later after the truck had been impounded. (DE134:26).

Subsequently, the FBI searched the postal truck. (DE133:202,231; GX 37 A-C, 40 A-B). The FBI saw a bullet hole in the rear bumper area. (DE133:232; GX 38 A-E). Because the bullet pierced the bumper, the FBI searched behind the bumper. (DE133:232–235; GX 39 A-D). During this part of the search, the FBI found what they call "other firearms evidence." (DE133:235–236; GX 8, 39-D; DE134:18-19).

The FBI's search recovered three bullets and three shell casings. (DE133:207; DE134:13–14). The FBI did not conduct any gunshot residue testing or trajectory and line of sight analysis. (DE134:22–23, 28).

Later that evening, law enforcement obtained the warrant for the townhouse. (DE133:208). During the search of the townhouse, the FBI found a loaded firearm and additional magazines in the rear bedroom. (DE133:212–213, 215–217; GX 1–5). The FBI also found a sports jersey that said, "White Boy 24" in this bedroom, as well as identification and mail belonging to "Charlie Holley." (DE133:212–213, 220–221; GX 21 K-L). In a different room, the FBI found a cartridge case. (DE133:221–222; GX 9, 23 A-C). In a third bedroom, the FBI found an empty ammunition box, and one live round, both .9 millimeter. (DE133:225–227; GX 6-7, 22 B-C).

## H.    Ms. Wicker identifies Mr. Holley from a photo lineup

A few days after the incident, Ms. Wicker identified Mr. Holley from a photo lineup as the person who had the rifle. (DE 133:54–56; DE134:110–111; GX 13).

## Sentencing

Before sentencing, Mr. Holley submitted a sentencing memorandum that requested a slight downward variance. (DE114). The memorandum explained that Mr. Holley, in his own words, "grew up in the projects." (DE114:1). When Mr. Holley was a newborn, his maternal grandfather "took" Mr. Holley away from his mother, likely due to her severe substance abuse problems. (DE114:1). Mr. Holley's mother never made any effort to be in her son's life. (DE114:1). She was an alcoholic who moved to Georgia and ultimately abandoned Mr. Holley. (D114:1). As for Mr. Holley's father, he was absent. (DE 114:1).

Fortunately, Mr. Holley's maternal grandmother—Marie Simmons—raised him as if he was her own child. (DE114:2). Ms. Simmons gave Mr. Holley a place to live and the love he never received from his parents. (DE114:1). While Ms. Simmons did the best she could to help raise Mr. Holley, their family was poor and struggled to make ends meet. (DE114:1). Mr. Holley's maternal grandfather—Joe Simmons—passed away when Mr. Holley was just two years old. (DE114:2). In response to his family's financial situation, Mr. Holley would leave school early to try and make money. (DE114:2). When he was

eleven years old, Mr. Holley would work in the fields planting and harvesting. (DE114:2). When he was fourteen years old, Mr. Holley worked at a Mexican restaurant. (DE114:2). Mr. Holley did his best to try to help his family put food on the table. (DE114:2).

Given that Mr. Holley had to work at such an early age, he unsurprisingly struggled in school. (DE114:2). He had to repeat second, third, and seventh grade. (DE114:2). He started using marijuana and drinking alcohol and was frequently suspended for fighting. (DE114:2). Notably, although Mr. Holley himself was never diagnosed with an intellectual disability, his brother and sister both received Supplemental Security Income for having an intellectual disability. (DE114:2). Ultimately, Mr. Holley dropped out of school in ninth grade without much of a plan for the future. (DE114:2). As with Mr. Holley's eloquent and heartfelt allocution, although his personal circumstances do not excuse his conduct, they do provide context to why he ended up before the Court in this case.

The other context of course is the severity of the mental health crisis Mr. Holley was undergoing in June 2021. (DE114:3). As noted earlier, Mr. Holley's prosecution stalled for several years because BOP

initially found Mr. Holley not competent to proceed to trial. (DE11,24, 32). Although the court eventually found Mr. Holley competent to proceed with this case, (DE 52), the findings from the competency evaluations reveal the state of Mr. Holley's mental health in June 2021.

Specifically, an April 14, 2022, Jeremiah Dwyer, a forensic psychologist at the Federal Detention Center in Englewood, Colorado determined that there was "sufficient information/evidence to indicate that Mr. Holley may be suffering from a mental disorder that significantly impairs his present ability to understand the nature and circumstances of the court proceedings against him, and his ability to properly assist counsel in his defense." (DE114:3, citing Apr. 14, 2022, FDC Eval. at p. 19). Within the report, Dr. Dwyer noted how Mr. Holley stated, "that during the four days prior to his arrest, he began to experience significant physical discomfort due to what he believed were 'electrical currents' and 'microwaves' being emitted into his residence (and the surrounding area)." (*Id.* at pp. 7–8). Mr. Holley further "reported these currents created uncomfortable physical sensations and sounds and impaired his ability to engage in basic functions such as eating, drinking or using his phone." (*Id.* at p. 8). Mr. Holley "believed

these beams were part [of] a control mechanism, and he voiced concerns that law enforcement was responsible." (*Id.* at p. 8).

As explained in Dr. Dwyer's report, Mr. Holley was paranoid that "law enforcement has had a history of attempting to sabotage him when he is employed [and] functioning well in the community[.]" (*Id.* at p. 16). Mr. Holley believed that his mail was "being 'messed with,' which he ascribed to law enforcement attempting to monitor him, and possibly provoke him." (*Id.* at p. 16). Mr. Holley did not know who was supposedly tampering with his mail, but he reported that he would "go to the mail box, and there would be all these opened envelopes." (*Id.*).

On January 10 and June 1, 2023, Mr. Holley was evaluated for a second time by FDC medical staff, this time by forensic unit psychologist Nicole Osborn. (DE114:4, citing June 1, 2023, FDC Evaluation). Dr. Osborn found that Mr. Holley "reports consistent and significant mental health symptoms." (*Id.* at p. 20). During these 2023 evaluations, Dr. Osborn noted how Mr. Holley "asserted he felt that police were setting him up by delivering an illegal package and noted concern [that] the mail carrier was working with police to set him up." (*Id.* at p. 10). Mr. Holley "described feeling 'paranoid' at the time and unplugging all of his

appliances because he felt 'microwave' electricity running through the wall and his feet." (*Id.* at p. 10). Moreover, "[h]e elaborated he believed police were emitting microwave electricity into his home." (*Id.* at p. 10). In conclusion, Dr. Osborn found that "[o]verall, given the bizarre nature of Mr. Holley's alleged offense, the consistency of his reported beliefs, and his observed level of functioning, it appears most likely that Mr. Holley suffers from a Delusional Disorder." (*Id.* at p. 19). Amongst other findings, Dr. Osborn noted that Mr. Holley "reported he planned to take his case to trial solely because he want[ed] to know what [was] in the delivered package[.]" (*Id.* at p. 21).

The evidence introduced at trial that showed pictures of Mr. Holley's home on the day of the offenses align with his delusions at the time. (DE114:5). Specifically, at trial, the government introduced pictures showing a broken microwave outside Mr. Holley's residence. (DE114:5).

Mr. Holley had thrown the microwave outside the window because he believed the electrical currents from the machine were manufactured by law enforcement to control him. (DE114:5). Evidence at trial also showed that there was a portion of the wall next to the staircase inside

the residence that had been torn out. (DE114:5). Mr. Holley had torn through the wall because he believed he could feel the currents coming through it. (DE114:5). In addition, during trial, Sheila Moss—who was located in the adjoining townhome—testified (according to counsel's recollection) that she could hear Mr. Holley loudly talking to himself through the walls. (DE114:5).

In sum, on the date of the offenses, Mr. Holley was in the peak of a psychotic, delusional episode. (DE114:5). In his paranoia, he believed that Officer Joe Shiver—the first responding officer at the scene of the crime—had been following him and had been unlawfully persecuting him for years (Mr. Shiver and Mr. Holley grew up together and went to the same high school). (DE114:5–6). He was convinced that the postal carrier was trying to deliver something that could be used to control him. (DE114:6). He did not want to hurt her; he just was not thinking clearly. (DE114:6). Indeed, the jury's finding of not guilty as to the attempted murder charge proves that Mr. Holley was not trying to harm Ms. Wicker. (DE114:6).

At sentencing, Mr. Holley recognized his crimes were serious and violent, but his limited mental capacity and severe delusional state on

the date of the offenses mitigated his culpability and should be considered

by the court when fashioning a fair sentence under 18 U.S.C. §3553(a).

(DE114:6).

> In denying Mr. Holley's request, the Court reasoned:
>
> I mean, we have to remember, Mr. Holley came to this Court after being found incompetent to proceed for quite some time. There was extensive competency proceedings. There's a very thorough medical evaluation, an explanation of his background and his mental condition in the presentence investigation report.
>
> On the day of this incident, it's pretty clear to me that surrounding that time period in Mr. Holley's life, he was in some sort of mental crisis. In fact, during the trial, I remember the victim herself having had somewhat of a pretty normal relationship and communication with Mr. Holley in the past.
>
> This was a situation that, albeit very serious, was somewhat uncharacteristic, I think, of Mr. Holley in the way in which this entire incident played out. So although it's not certainly an excuse, it doesn't mean that the mental health concerns warrant a variance.
>
> I think that a variance, unfortunately, in my view would not be sufficient, given this sentence, to truly reflect the nature and circumstances of the offense . . . .

(DE136:37–38).

## Standards of Review

Whether out-of-court statements are "testimonial" for purposes of the Confrontation Clause is a question of law that this Court reviews *de novo. See generally Crawford v. Washington,* 541 U.S. 36, 68 (2004); *United States v. Underwood,* 446 F.3d 1340, 1345 (11th Cir. 2006). This Court reviews Confrontation Clause violations for harmless error. *United States v. Hunerlach,* 197 F.3d 1059, 1067 (11th Cir.1999). The prosecution has the burden of showing that a constitutional trial error is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24 (1967).

The district court's decision to admit statements over a hearsay objection is reviewed for an abuse of discretion. *United States v. Kent*, 93 F.4th 1213, 1217 (11th Cir. 2024). Similarly, the Court reviews a judge's determination that relevant evidence is admissible, rather than excludable under Federal Rule of Evidence 403, for an abuse of discretion. *United States v. Wall*, 116 F.4th 1285, 1297 (11th Cir. 2024).

The reasonableness of a sentence is reviewed for abuse of discretion. *United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011).

## SUMMARY OF THE ARGUMENTS

The district court violated Mr. Holley's Sixth Amendment right to confrontation by admitting various testimonial witness statements made to a police officer and captured on a body-worn camera. None of the unidentified speakers captured in these clips were distressed or calling for help. Instead, the clips recorded the officer investigating the offenses by trying to speak to potential witnesses. The citizen speakers depicted in these clips are not describing current circumstances as they were happening, but rather, they were describing past events. Therefore, the officer's questions and the witnesses' statements were less about addressing the earlier emergency—the shot fired at the mail truck—and more about gathering information for an investigation. Accordingly, the government's introduction of these statements violated Mr. Holley's Sixth Amendment right to confrontation.

In the alternative, the district court erred because these statements were inadmissible hearsay. There is no indication that these unidentified speakers were under the stress of any startling event that would support the excited utterance exception. Furthermore, these speakers explained

past, not contemporaneous, events that render the present sense impression exception inapplicable.

Finally, the district court's ruling violated Federal Rules of Evidence 401–403. While the government purportedly introduced these clips to explain how the police "buil[t] their investigation out," they were unnecessary for that purpose. (DE134:8). Moreover, these recordings went well beyond the police's need to respond to the scene and into an investigation of a crime and the ultimate issue in the case. The government introduced evidence that implicated the ultimate issues in the case, not to explain the background of the police investigation but to support the government's case against the defendant. The district court erred by permitting the government to make this end-run around the Federal Rules of Evidence.

The district court made other erroneous evidentiary rulings. The district court allowed the government to introduce the entire 911 call made by an unidentified man and the statements made by a different unidentified man at the scene who claimed to be Mr. Holley's brother. The district court erred because these statements were inadmissible hearsay and violated Federal Rules of Evidence 401–403.

First, there is no indication that the 911 caller had personal knowledge of the events he described. Second, the unidentified man calmly spoke to the 911 operator. Third, the caller's statements clearly referred to past events. Therefore, neither the excited utterance nor present sense impression exception permitted introduction. Moreover, these statements were of weak probative value and unduly prejudicial.

Regarding the "brother," the government asserted that the non-hearsay purpose of this evidence was "[i]n terms of building our investigation out." (DE136:8). However, this evidence was not necessary for that purpose. The only reasonable conclusion this Court can reach is that the government offered this evidence—that implicated the ultimate issues in the case—to prove the case against Mr. Holley. Therefore, because this non-testifying witness specifically linked Mr. Holley to the crime, the testimony constituted inadmissible hearsay.

The 192-month sentence the district court ordered Mr. Holley to serve lies outside the range of reasonable sentences based on the specific facts of this case. Section 3553(a) requires a court to engage in a fact-intensive and case-specific inquiry about the type of sentence that would be sufficient but not greater than necessary to achieve the ends of

sentencing. Here, the district court did not adequately consider Mr. Holley's mental health crisis on the day of the offenses in imposing sentence. Considering his acknowledged crisis, the § 3553(a) factors make clear that a substantially shorter sentence would have accomplished the statutory goal.

## ARGUMENTS AND CITATIONS OF AUTHORITY

## ISSUE I

**THE DISTRICT COURT VIOLATED MR. HOLLEY'S SIXTH AMENDMENT RIGHT TO CONFRONTATION BY ADMITTING VARIOUS TESTIMONIAL WITNESS STATEMENTS MADE TO A POLICE OFFICER AND CAPTURED ON A BODY-WORN CAMERA. IN THE ALTERNATIVE, THE DISTRICT COURT ERRED BECAUSE THESE STATEMENTS WERE INADMISSIBLE HEARSAY. THE DISTRICT COURT'S RULING ALSO VIOLATED FEDERAL RULES OF EVIDENCE 401–403.**

At trial, the district court allowed the government to introduce various body-worn camera "clips" that depicted unidentified persons speaking with Officer Neyra. Through these clips, the government presented out-of-court statements to the jury that went to the ultimate issues in the case. Notwithstanding, the government's stated purpose for introducing this evidence was to have the jury see and hear how the police "buil[t] our investigation out." (DE134:8). Curiously, the government supported this argument by declaring that the body-worn camera footage that they sought to introduce did not constitute "evidence." (DE134:13). The prosecutor elaborated: "Well, again, our position -- and this is why we didn't do transcripts for any of these, and we're going to be playing them briefly and then moving on, is that *none of*

*this is evidence*."). Regardless, these clips were evidence against Mr. Holley and the introduction of these out-of-court statements violated his Sixth Amendment right to confrontation, did not satisfy any hearsay exception, and were irrelevant and unduly prejudicial under Rules 401–403.

**A.    The Confrontation Clause bars the use of "testimonial" statements—which include witness statements made to investigating police officers—like the statements made to Officer Neyra and depicted on the body-worn camera footage.**

The district court violated Mr. Holley's Sixth Amendment right to confrontation by allowing the government to introduce the following body-worn camera footage:

- Government Exhibit 15-C depicted an unidentified man speaking to his mother on a phone. (DE134:91; GX 15-C). While this man was on the phone, Officer Neyra questioned him about whether he knew the person in the townhouse. (DE134:92–93; GX 15-C). In turn, the man asked his mother, "what's White Boy's real name?" (DE134:92–93; GX 15-C). When Officer Neyra followed-up with the man, he said that his mother said, "She just say White Boy." (DE134:92–93; GX 15-C).

- Exhibit 15-D showed Officer Neyra talking to unidentified woman. (GX 15-D). In this video, the woman, pointed at a townhouse, and told Officer Neyra that is "where the lady got injured." (GX 15-D). She also said that the person "who did it," lives there. (GX 15-D). She also confirmed for the officer that the person is known as "White Boy." (GX 15-D).

- Exhibit 15-E recorded Officer Neyra talking to an unidentified man, in Spanish, about "White Boy." (GX 15-E). The man told Officer Neyra that "the subject was renting in that area. He was a light, mulatto, tall male with light eyes that was renting." (DE134:94).

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall ... be confronted with the witnesses against him...." In *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court held that consistent with the Confrontation Clause guarantee, a "testimonial" statement made by a declarant who does not testify at trial is admissible against an accused *only* if the declarant is unavailable, and the accused was afforded a prior opportunity for cross-examination. *Id.* at 59, 68-69.

Although *Crawford* did not formulate a definition for "testimonial" statements, the Supreme Court emphasized that under any definition, "[s]tatements taken by police officers in the course of interrogations" are testimonial statements. *Id.* at 52-53. Based upon the historical background and the principal evil at which the Framers directed the Confrontation Clause, courts, starting with the Supreme Court, have broadly defined interrogation that meets *Crawford*'s testimonial standard. *See Davis v. Washington*, 547 U.S. 813, 822 n.1 (2006) ("The

Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation."); *see also Crawford*, 541 U.S. at 53 n.4 (noting that the Court, for Confrontation Clause purposes, uses "the term 'interrogation' in its colloquial, rather than any technical legal, sense.").

The Supreme Court acknowledged in *Davis* that while a "call for help against bona fide physical threat" is not testimonial, a conversation that begins as an interrogation to determine the need for emergency assistance can "evolve into testimonial statements" once that purpose has been achieved. *Id.* (quotation marks omitted). Indeed, the *Davis* Court noted that given the operator's "battery of questions" after the emergency appeared to have ended, "[i]t could readily be maintained that, from that point on, [the caller's] statements were testimonial, not unlike the 'structured police questioning' that occurred in *Crawford* [*v. Washington*, 541 U.S. 36, 53 n.4 (2004)]." 547 U.S. at 828-29. The Supreme Court noted that when trial courts "recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial," "[t]hrough *in limine* procedure, they should redact or

exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." *Id.*

Here, we do not have the issue presented in *Davis*—none of the speakers in the above-noted clips were calling for help. Rather, Officer Neyra was investigating the shooting by trying to speak to potential witnesses. By the time Officer Neyra recorded his encounters with the unidentified speakers, the police had arrived on the scene. (DE133:89–90). Indeed, officers arrived at the scene while Ms. Wicker was speaking with the 911 operator. (DE133:51, 53–54).

Moreover, the police knew at this time that the investigation's subject was not "at large" but barricaded in the townhouse. (DE136:109). Therefore, Officer's Neyra's questions and the witnesses' statements were less about addressing the earlier emergency—the shot fired at the mail truck—and more about gathering information for an investigation. The citizen speakers depicted in government exhibits 15 C-E are not describing current circumstances as they were happening, but rather, they were describing past events.

43

For example, in GX 15-D the government played a clip for the jury where they saw an unidentified woman pointing at a townhouse and heard his person telling Officer Neyra that is "where the lady got injured." (GX 15-D). She also said that the person "who did it" lived there. (GX 15-D). She also confirmed for the officer that the person is known as "White Boy." (GX 15-D). In GX 15-C & D, the unidentified speakers are relaying to Officer Neyra, who they believe lived in the townhouse, and his name. (DE134:92–94).

These speakers were not facing an ongoing emergency because they were outside the perimeter and not in danger from the barricaded subject. These statements were not necessary to be able to *resolve* any present emergency, rather than simply to learn what happened in the past. These circumstances objectively demonstrate that the primary purpose was not to enable police assistance to meet an ongoing emergency; these speakers were acting as witnesses.

An objective inquiry of the circumstances surrounding these events statements confirms this proposition. The Supreme Court has instructed that *Crawford* requires a court to "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the

parties" to determine "the primary purpose of the interrogation." *Michigan v. Bryant,* 562 U.S. 344, 358-359 (2011). Under an objective evaluation, the unidentified speakers' interactions with Officer Neyra would lead a speaker reasonably to believe that her statements would be available for use at a later trial. *See id*; *United States v. Curbelo*, 726 F.3d 1260, 1272 (11th Cir. 2013) (testimonial statements include statements that are the "functional equivalent" of in-court testimony, such as affidavits, depositions, prior testimony and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."); *United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005) ("statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial are testimonial.").

First, as previously discussed, the witnesses' statements reported "what happened" rather than "what is happening." *Davis v. Washington*, 547 U.S. 813, 829–30 (2006) (concluding statements were testimonial because the officer was seeking to determine "what happened" and "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the

interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.).

Second, based on the content and context of the encounter, a reasonable witness would have understood law enforcement's primary purpose to be investigative. *United States v. Cooper*, 926 F.3d 718, 731 (11th Cir. 2019) (recognizing that statements to police officers are generally testimonial if the primary purpose is investigative).

Third, the interaction between these speakers and Officer Neyra was formal. *Cf. United States v. Hano*, 922 F.3d 1272, 1287 (11th Cir. 2019) (statements were non-testimonial because they arose from a "friendly and informal exchange in which [the declarant] happened to reveal evidence that would ultimately be critical to the government's case."). These encounters between the speakers and Officer Neyra could not reasonably be viewed as friendly and informal.

Under *Crawford*, these statements were testimonial. Moreover, as will be discussed below, *infra* pp. 62–65, while the government's avowed purpose for introducing these statements was to show how they "built the investigation out," the real purpose was to prove the truth of the matter asserted. (DE134:8); *see Crawford,* 541 U.S. at 59 n. 9. ("The

Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Because Mr. Holley did not have the opportunity to cross-examine these declarants at trial, the admission of their statements violated the Confrontation Clause.

**B.    The district court also erred because the witnesses' statements on the body-worn camera footage constitute inadmissible hearsay.**

The district court did not heed the Federal Rules of Evidence's limitations on the admission of these types of recordings. Assuming that hearsay statements on body-worn camera footage may be admitted into evidence as a "business record," under Fed. R. Evid. 803(6), a recorded statement by a citizen must also satisfy a separate hearsay exception. *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); *see also*, *e.g.*, *United States v. Sallins*, 993 F.2d 344, 347 (3d Cir. 1993) (noting that "even if the 911 record itself is admissible under Rule 803(8), details as to the out-of-court statements made by the person who called 911 are not admissible unless covered by a separate hearsay exception.").

Under certain circumstances, citizen statements on these types of recordings may qualify as a "present sense impression," Fed. R. Evid. 803(1), or an "excited utterance," Fed. R. Evid. 803(2). The government and the district court relied on these two exceptions. (DE82).

But "to qualify under either exception, an out-of-court statement must be nearly contemporaneous with the incident described," *and* the declarant must have personal knowledge of what she describes. Fed. R. Evid. 602; Fed. R. Evid. 803 Advisory Comm. Notes (1972). Furthermore, the government had the burden of demonstrating the applicability of each hearsay exception. *United States v. Rodriguez*, 591 F. App'x 897, 901 (11th Cir. 2015)

Under Rule 803(2), the excited-utterance exception, the government had to prove (1) the occurrence of a startling event, (2) the declarant made the statement while under the stress of the event, and (3) a nexus between the content of the statement and the event. *United States v. Irizarry-Sisco*, 87 F.4th 38, 45 (1st Cir. 2023); *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1314 (11th Cir. 2022).

Under Rule 803(1), a present sense impression is a "statement describing or explaining an event or condition, made while or

48

immediately after the declarant perceived it." Fed. R. Evid. 803(2); *see*
*United States v. Scrima*, 819 F.2d 996, 1000 (11th Cir. 1987) (citation
omitted). The Advisory Committee's Note indicates that the present sense
impression has a shorter permissible time lapse and narrower breadth of
subject matter. 7 Handbook of Fed. Evid. § 803:1 (9th ed.). Finally, "when
declarant is an unidentified bystander, the cases indicate hesitancy in
upholding the statement alone as sufficient, a result which would under
appropriate circumstances be consistent with the rule." Fed. R. Evid.
803(1)-(2) Advisory Committee's Note (1972).

The citizen hearsay statements made in GX 15 C-E—and described
*supra* at pp.50–51—do not satisfy either of the proffered exceptions.
There is no indication that the man depicted in the clip (or his mother)
was under the stress of any startling event when they made their
statements. *See United States v. Leones*, No. 22-12456, 2024 WL 340324,
at *2 (11th Cir. Jan. 30, 2024)(noting that declarants "did not appear
agitated or under duress," and "did not make their statements
spontaneously" in deciding statements did not qualify as excited
utterances). Similarly, the man on the phone appears calm, cool, and

collected. His mother is not seen or heard. Therefore, the government failed to prove the applicability of the excited utterance exception.

Neither the man depicted in the clip (nor his mother) offered a description or explanation while perceiving an event or condition. Instead, they were relating what they knew based on prior knowledge and experience. *See, e.g., United States v. Lentz*, 282 F. Supp. 2d 399, 411 (E.D. Va. 2002), *aff'd*, 58 F. App'x 961 (4th Cir. 2003)(alleged victim's statements to witness that she fought with defendant who had pushed her and caused her to fall into wall, were not admissible at trial under present sense impression exception to hearsay rule to show prior abuse; statements were not made while victim was experiencing or perceiving abuse that occurred). Therefore, for GX 15-C, the present sense impression exception is also inapplicable.

The same analysis holds true for exhibit 15-D, described *supra* at p. 60. There is no indication that this unidentified speaker was under the stress of any startling event that would support the excited utterance exception. *See Leones*, 2024 WL 340324, at *2. And this speaker explained past, not contemporaneous, events that render the present sense impression exception inapplicable. *See United States v. Holden*, 625

F. App'x 316, 318 (9th Cir. 2014)(holding statements were not "present sense impressions" because they did not describe or explain an event declarant was currently perceiving). Furthermore, there is insufficient proof that this unidentified person spoke from personal knowledge. *See Bemis v. Edwards*, 45 F.3d 1369, 1373 (9th Cir. 1995)(noting requirement that a declarant have personal knowledge of the events described applies to the present sense impression exception).

Exhibit 15-E, described *supra* at p.50–51, suffers from the same evidentiary infirmity. There is no indication that this unidentified speaker was under the stress of any startling event, and he clearly was describing a past event. Accordingly, the district court erred by allowing the government to introduce these hearsay statements.

## C. The body-worn camera footage also violated Rules 401- 403.

Finally, even if these out-of-court statements qualified under an exception to the hearsay rules, the court should have excluded this evidence as irrelevant and unduly prejudicial. Under the Federal Rules, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence that

is *not* relevant is not admissible. Fed. R. Evid. 402. And even if relevant, the court must exclude evidence under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Rule 403's "major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Mills*, 704 F.2d 1553, 1560 (11th Cir. 1983)). Notably, "as the probative value of evidence decreases, the potential increases for it to be substantially outweighed by the dangers identified in the rule." *United States v. Rewald*, 889 F.2d 836, 853 (9th Cir. 1989).

While the government purportedly introduced these clips to explain how the police "buil[t] their investigation out," they were unnecessary for that purpose. (DE134:8). The defense never questioned why the police initially identified Mr. Holley as a suspect. Moreover, as described above, these recordings went well beyond the police's need to respond to the scene and into an investigation of a crime and the ultimate issue in the case.

"Where the government introduces evidence that bears on the ultimate issue in the case but that is not necessary to explain the background of a police investigation, the only reasonable conclusion we can reach is that the evidence was offered, not as background, but as support for the government's case against the defendant." *United States v. Minners*, 362 F. App'x 931, 937 (10th Cir. 2010). Accordingly, in *Minners,* the Tenth Circuit found the trial court erred by admitting a 911 call in a felon-in-possession case where the officer testified about the nature of the call that had triggered his investigation, thus making the recording unnecessary. *Id.* Similarly, Ms. Wicker testified as to the events that triggered the police response and the officers testified as to how they responded. (DE133:33–68; 87–169).

"While officers generally should be allowed to explain the context in which they act, the use of out-of-court statements to show background has been identified as an area of 'widespread abuse.'" *United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993) (quoting 2 McCormick on Evidence § 249 (4th ed. 1992) (admission of 911 call containing description and fact that man had gun required reversal)). In such cases, "[t]he need for this evidence is slight, the likelihood of misuse great." 2

McCormick on Evidence § 249 (8th ed.). Accordingly, courts have cautioned, "a police officer cannot repeat such out-of-court accusations at trial, even if helpful to explain why the defendant became a suspect or how the officer was able to obtain a search warrant." *United States v. Jones*, 930 F.3d 366, 377 (5th Cir. 2019) (citing cases). And in particular, as argued above, "[s]tatements exceeding the limited need to explain an officer's actions can violate the Sixth Amendment - where a nontestifying witness specifically links a defendant to the crime, testimony becomes inadmissible hearsay." *Id.* (quoting *United States v. Kizzee*, 877 F.3d 650, 659 (5th Cir. 2017)).

Although the district court gave a limiting instruction, this admonition was insufficient to cure the prejudice to Mr. Holley. *United States v. Lasley*, 917 F.3d 661, 665 (8th Cir. 2019) (per curiam) (noting caselaw holding that a limiting instruction is unlikely to protect against highly prejudicial information when that information went to the heart of the prosecution's case); *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013), *as clarified on denial of reh'g (*Jan. 16, 2014)("Although the district court gave the jury a limiting instruction after each officer's testimony—reminding them that the evidence about the suspect's

54

description was not to be considered for its truth—the prejudicial nature of the evidence and the fact that it went to the key issue for the jury's resolution made it unlikely that the limiting instruction adequately protected Nelson from prejudice. A limiting instruction is not always sufficient to cure the harm of highly prejudicial information improperly admitted at trial.").

For all these reasons, the district court erred by allowing the government to play the body-worn camera clips to the jury. As a result, this Court should vacate Mr. Holley's convictions and remand for a new trial.

## ISSUE II

**THE DISTRICT COURT ALLOWED THE GOVERNMENT TO INTRODUCE THE ENTIRE 911 CALL MADE BY AN UNIDENTIFIED MAN AND THE STATEMENTS MADE BY A DIFFERENT UNIDENTIFIED MAN AT THE SCENE WHO CLAIMED TO BE MR. HOLLEY'S BROTHER. THE DISTRICT COURT ERRED BECAUSE THESE STATEMENTS WERE INADMISSIBLE HEARSAY AND VIOLATED FEDERAL RULES OF EVIDENCE 401–403.**

The district court erred by allowing the government to introduce other out-of-court statements by unidentified speakers that implicated Mr. Holley. Both of these statements constitute inadmissible hearsay,

and, in addition, the court should have excluded them under Federal Rules of Evidence 401-403.

## A.    The unidentified 911 caller

After Ms. Wicker called 911, an unidentified man called a 911 operator. (DE134:128–129; GX 14). During the call, the man told the police operator:

> At my house this man has shot at the mail lady man.
>
> He said he gone kill everybody and he's walking around with a semi automatic rifle.
>
> He shot at her man. He been pulling guns on everybody (inaudible).

(GX 14). Later, when the operator asked the caller for his address he could not. (GX 14).

Mr. Holley asserted that this call constituted inadmissible hearsay and unduly prejudicial under Federal Rule of Evidence 403. (DE69). The government responded that the caller's statements were excited utterances or present sense impressions and were relevant "because they corroborate the victim's statements that a shooting occurred, that the Defendant continued to yell after firing his rifle at the victim's postal truck and that the shooter remained at the scene and did not flee."

(DE82). The district court agreed that the call satisfied the two proffered hearsay exceptions and was not unduly prejudicial. (DE131:22-23).

The district court erred. First, there is no indication that the caller had personal knowledge of these purported events. He did not say, for example, "I saw him…," or "I heard him…." Second, on the call the unidentified man seems calm; he did not appear to be agitated or under any stress. *Leones*, No. 22-12456, 2024 WL 340324, at *2. Third, because the police never identified (or attempted to do so) the caller, the government cannot rely on the statement alone to meet their foundational burden. *See* Fed. R. Evid. 803(1)–(2) Advisory Committee's Note (1972). Therefore, the excited utterance exception is inapplicable.

The district court's present sense impression ruling fares no better. Again, there is insufficient evidence that the caller spoke from personal knowledge. Second, because Ms. Wicker testified that the shot came from inside the townhouse and there was no evidence that during their encounter Mr. Holley had been on the street, the caller's statements clearly referred to past events outside the ambit of Rule 803(1). *See* 7 Handbook of Fed. Evid. § 803:1 (9th ed.)(present sense impression has a shorter permissible time lapse and narrower breadth of subject matter).

Finally, because the government never identified the caller, the government failed to meet this foundational element.

Moreover, these statements were of weak probative value and unduly prejudicial. First, the jury heard the caller say: "He said he gone kill everybody and he's walking around with a semi automatic rifle." (GX 14). But we know from Ms. Wicker's testimony that the shooter was not "walking around" but remained in the townhouse. Also, there is no evidence that Mr. Holley had "been pulling guns on everybody (inaudible)." (GX 14).

The unfair prejudice from this evidence—from an unknown witness who lied about his relationship with Mr. Holley—is palpable. The Supreme court has recognized that unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). This evidence enticed the jury to focus not on Mr. Holley's encounter with Ms. Wicker but on other purported events.

## B.    The unidentified "brother"

After Sergeant Mohammed arrived on the scene, a person who identified himself as "the subject's brother" approached him by car. (DE133:111; GX 50-A). According to Sergeant Mohammed, the "brother" told him Mr. Holley's name, that there was an assault rifle in the townhouse, and that he was alone. (DE133:111; GX 50-A). Although Sergeant Mohammed wore a body camera, he did not record the entire exchange. (DE133:121; GX 50-A). Sergeant Mohammed relayed this information to other officers. (DE133:112).

> The government stated that this evidence was relevant because:
>
> This is again, and the testimony we're going to elicit from both of these officers is that gathering this information affected how they conducted their investigation, how they perimeterized [sic], where they perimeterized [sic], the types -- how they developed information that it was the defendant in the house who was subsequently arrested inside of the house."

(DE136:6). In other words, the government asserted that the non-hearsay purpose of this evidence was "In terms of building our investigation out." (DE136:8). The district court admitted this evidence over the defense's objection. (DE136:32).

As previously discussed, "Where the government introduces evidence that bears on the ultimate issue in the case but that is not necessary to explain the background of a police investigation, the only reasonable conclusion we can reach is that the evidence was offered, not as background, but as support for the government's case against the defendant." *Minners*, 362 F. App'x at 937.

"While officers generally should be allowed to explain the context in which they act, the use of out-of-court statements to show background has been identified as an area of 'widespread abuse.'" *United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993) (quoting 2 McCormick on Evidence § 249 (4th ed. 1992) (admission of 911 call containing description and fact that man had gun required reversal)). In such cases, "[t]he need for this evidence is slight, the likelihood of misuse great." 2 McCormick on Evidence § 249 (8th ed.). Accordingly, courts have cautioned, "a police officer cannot repeat such out-of-court accusations at trial, even if helpful to explain why the defendant became a suspect or how the officer was able to obtain a search warrant." *United States v. Jones*, 930 F.3d 366, 377 (5th Cir. 2019) (citing cases). And in particular, "[s]tatements exceeding the limited need to explain an officer's actions

can violate the Sixth Amendment - where a nontestifying witness specifically links a defendant to the crime, testimony becomes inadmissible hearsay." *Id.* (quoting *United States v. Kizzee*, 877 F.3d 650, 659 (5th Cir. 2017)).

## ISSUE III

**BY FAILING TO ADEQUATELY WEIGH THE IMPACT THAT MR. HOLLEY'S MENTAL HEALTH CRISIS HAD ON THE COMMISSION OF THE OFFENSE, THE DISTRICT COURT IMPOSED A SUBSTANTIVELY UNREASONABLE SENTENCE.**

The district court violated 18 U.S.C. §3553(a) by failing to adequately weigh Mr. Holley's mental health issues in fashioning an appropriate sentence. This substantive error rendered Mr. Holley's sentence unreasonable. *See United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*).

Congress, under 18 U.S.C. § 3553(a)(1), requires a court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Moreover, scholarship in the area of dual diagnoses and recidivism has shown that increased prison sentences are not an effective means of breaking the cycle of mental illness, substance abuse, and criminal behavior. *See, e.g.*, Henry J. Steadman &

Michelle Naples, *Assessing the Effectiveness of Jail Diversion Programs for Persons with Serious Mental Illness and Co-Occurring Substance Use Disorders*, 23 Behav. Sci. & L. 163, 170 (2005) ("Taken together with the findings from previous studies on jail diversion, the results from these six sites provide mounting evidence that jail diversion results in positive outcomes for individuals, systems, and communities."). To appropriately determine Mr. Holley's sentence, the court should have given significant weight to his mental illness and his need for treatment services. The district court erred in failing to give sufficient weight to this evidence.

The Supreme Court has held that, when challenged, appellate courts must review all sentences—regardless of whether they are inside or outside the applicable sentencing range—for reasonableness. *See Gall v. United States*, 552 U.S. 38, 41 (2007). *Gall* made clear that though the guidelines are a starting point, courts "may not presume that the Guidelines range is reasonable." *Id*. at 50. Instead, after calculating the applicable guidelines range, sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a) and determine the appropriate sentence in each case based on an "individualized assessment" of the facts presented. *Id*. Specifically, the Supreme Court directed judges to treat

"every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id*. at 51.

Courts review challenges to the reasonableness of a sentence for an abuse of discretion standard. *Gall*, 552 U.S. at 41. Applying that standard of review, this Court has held that "[a] district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189 (citing *United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006) (*en banc*)). When evaluating the reasonableness of a sentence under the third factor, "a district court commits a clear error of judgment when it considers the proper factors but balances them unreasonably." *Id*. (citing *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005) ("[A]n abuse of discretion can occur . . . when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment.")). That is what happened in this case.

At the sentencing hearing, the district court recognized:

I mean, we have to remember, Mr. Holley came to this Court after being found incompetent to proceed for quite some time. There was extensive competency proceedings. There's a very thorough medical evaluation, an explanation of his background and his mental condition in the presentence investigation report.

On the day of this incident, it's pretty clear to me that surrounding that time period in Mr. Holley's life, he was in some sort of mental crisis. In fact, during the trial, I remember the victim herself having had somewhat of a pretty normal relationship and communication with Mr. Holley in the past.

This was a situation that, albeit very serious, was somewhat uncharacteristic, I think, of Mr. Holley in the way in which this entire incident played out. So although it's not certainly an excuse, it doesn't mean that the mental health concerns warrant a variance.

(DE136:37–38).

In imposing sentence, however, the district court failed to give adequate weight to that compelling mitigation. Instead of considering a slight variance as defense counsel requested, the court imposed a sentence within the guideline range, with little explanation about how the lengthy commentary on Mr. Holley's well-documented struggles with mental health factored into that determination.

The 192-month sentence the district court imposed on Mr. Holley lies outside the range of reasonable sentences based on the specific facts

of this case. As noted at the outset, § 3553(a) requires a court to engage in a fact-intensive and case-specific inquiry about the type of sentence that would be sufficient but not greater than necessary to achieve the ends of sentencing. *See Gall*, 552 U.S. at 50. Here, a review of the § 3553(a) factors makes clear that a substantially shorter sentence would accomplish that goal.

The nature and circumstances of the offenses are inextricably intertwined with Mr. Holley's mental health crisis. (DE114:3, citing Apr. 14, 2022, FDC Eval.). Within the report, Dr. Dwyer noted how Mr. Holley stated "that during the four days prior to his arrest, he began to experience significant physical discomfort due to what he believed were 'electrical currents' and 'microwaves' being emitted into his residence (and the surrounding area)." (*Id.* at pp. 7–8). Mr. Holley further "reported these currents created uncomfortable physical sensations and sounds and impaired his ability to engage in basic functions such as eating, drinking or using his phone." (*Id.* at p. 8). Mr. Holley "believed these beams were part [of] a control mechanism, and he voiced concerns that law enforcement was responsible." (*Id.* at p. 8). While Mr. Holley recognizes the seriousness of his offenses, this aggravating factor is a

direct consequence of his mental health crisis. (*See* DE114:3-6; PSR at ¶¶ 77–78).

Against that backdrop, placing Mr. Holley in a high-security federal penitentiary that cannot address his medical needs—as opposed to imposing a shorter, more reasonable term of incarceration that is not unduly punitive and then imposing conditions of supervision that ensures his mental health needs are addressed—does little to accomplish the other aims of sentencing, such as deterrence, protection of the public, and affording the opportunity for necessary treatment.

Instead, the district court's sentence perpetuates the cycle that Mr. Holley has experienced for most of his life. Properly considered under § 3553(a), the substantial mitigation presented by Mr. Holley's mental health issues makes the 192-month sentence imposed in this case substantively unreasonable.

Finally, the guideline range took into account all of the factors that made Mr. Holley's conduct serious. (PSR ¶¶at 21–23, 93). To penalize him again for these factors while failing to afford just weight to the mental health issues underlying them constitutes an abuse of discretion under this Court's precedent. *See Irey*, 612 F.3d at 1189.

Had the district court properly considered the § 3553(a) factors and afforded them appropriate weight—as Congress requires—the sentence would have been far less than 192 months' imprisonment. Such a sentence is unsupported by the sentencing factors and, therefore, is substantively unreasonable.

## CONCLUSION

For the preceding reasons, this Court should vacate Charlie Holley's convictions and sentence.

Respectfully submitted,

HECTOR A. DOPICO
Federal Public Defender

*/s/ Michael Caruso*
MICHAEL CARUSO
Assistant Federal Public Defender
Attorney for Appellant
150 West Flagler Street, Suite 1700
Miami, Florida 33130
(305) 533-4200

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,915 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.

/s/ *Michael Caruso*
MICHAEL CARUSO

**CERTIFICATE OF SERVICE**

I HEREBY certify that on this 4th day of November 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent four copies to the Clerk of the Court via third-party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Daniel Matzkin, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

*/s/ Michael Caruso*
MICHAEL CARUSO